UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. 3:05-CV-393-H

**AMANDA MATTINLGY**                                                                      **PLAINTIFF**

**V.**

**UNIVERSITY OF LOUISVILLE and**                                                **DEFENDANTS**
**DR. SHAWN PARKHURST**

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

---

Comes the Plaintiff, Amanda Mattingly-Silva[1], by counsel, and submits the following in opposition to Defendants University of Louisville and Dr. Shawn Parkhurst's Motion for Summary Judgment.

## INTRODUCTION

Plaintiff was raped while participating in the University of Louisville's study-abroad program in Portugal in 2004. The trip was offered and sponsored by the University of Louisville and supervised by Professor Shawn Parkhurst. Plaintiff's legal remedies are sought under Title IX and breach of contract.

Plaintiff concedes to Defendants' argument that Dr. Parkhurst, as an individual, may not be held personally liable under Title IX. Therefore, Plaintiff voluntarily dismisses this claim.

## FACTS

### A. Preparing for Portugal

Ms. Mattingly became acquainted with Professor Parkhurst in classes taught by him at the University of Louisville (hereinafter "UofL"). (Plaintiff's depo. at p. 161). At the suggestion of Professor Parkhurst, Amy and twelve other UofL students attended a study abroad program in Portugal in 2004.

Prior to the trip, the students attended a one-day orientation held on UofL's campus. Id. at 169). The meeting lasting approximately two to three hours, during which the trip itinerary were discussed. (Id.) The students were given an "orientation packet," containing a list of websites, links and other general information regarding Portugal and the City of Lisbon. (Id.).

During orientation, Professor Parkhurst stressed to the students that they should try and "blend in" as much as possible, to keep their valuables close to them, to not drink in excess and that if they were to do drugs, "don't let me catch you." (Id. at 185-186). As to sexual relations with native Portuguese, Professor Parkhurst had a "don't ask, don't tell" policy. (Id. at 187). There was no discussion or warnings as to the characteristics of the Portuguese men or the gender relations in Portugal.

Professor Parkhurst's policy on the students having sex with natives was much like taking drugs, that is Professor Parkhurst did not want to find out about it. (Id. at 188).

### B. Amy's Arrival in Portugal

Amy left for Portugal on June 30, 2004. (Id. at 194). Upon arrival, Professor Parkhurst left the students to themselves. (Id. at 187). Amy adamantly denies UofL's

---

[1] The Plaintiff's full name is Amanda Lillian Mattingly Silva, but generally goes by "Amy."

claims that she was hoping to have sexual relations with a Portuguese man or to any "contest" as to which girl would sleep with Professor Parkhurst first. (Id. at 201).

Around the second or third day the students were in Portugal, several female students returned to a restaurant where they had previously eaten. (Id. at 207). Amy and the girls recognized a man who had been present at the restaurant before. (Id.). Eventually, the man (now known as being named "Pedro") had a waiter at the restaurant send a note to the girls at their table, asking if they would like to go clubbing. (Id. at 209). The girls declined. (Id.). Later that night, Pedro spoke to the table of girls with the help of Jennifer Ward ("Jennifer"), another student in the group who spoke fluent Portuguese and translated for Pedro. (Id. at 210). The conversation was casual. Pedro and Amy had no direct conversation with each other, but rather the conversation was as a group. (Id.).

That same night, there was a soccer game of national interest being broadcast. The waiter at the restaurant and Pedro asked the girls if they would like to watch the game with them at a neighboring restaurant and bar. (Id. at 211-212). The girls agreed. (Id. at 212). Amy did not consume alcohol that evening.

When the game ended, Amy accepted a ride from Pedro and his English speaking friends back to the dorms. (Id. at 213). Amy was supposed to be dropped back off at the dorms. (Id. at 216). However, first, Pedro friends were dropped off. (Id.) Amy then realized that Pedro was not heading to the dorms. (Id. at 218). She began to "throw a fit" in the car, asking Pedro what was going on. (Id. at 219). Pedro did not respond to Amy's protests. He proceeded to park his car near a beach and began to come onto Amy. (Id. at 221). He continued to force himself upon Amy, overpowered her, and proceeding to rape her. (Id. at 222).

3

Stunned, upset and scared, Amy began to cry and insisted Pedro take her to the dorms. (Id. at 224). When Amy returned to her dorm room, she awoke her roommate Angela and asked why she did not call Professor Parkhurst when Amy did not return to the dorms in twenty minutes. (Id.). Angela replied that she had forgotten. (Id.).

### C. Following the Rape

The following day, **Monday July 5, 2004**, was the first day of classes. That day, Amy approached her classmate Jennifer Ward and told her what happened. (Id.) Jennifer went to Professor Parkhurst. (Id.)

When Amy was questioned about the rape by Professor Parkhurst, he offered no assistance. (Id.). He did not discuss going to the police or the hospital. (Id.). Amy adamantly disputes conflicting testimony that she refused to report the rape to the police or go to the hospital. (Id. at 228). Although Amy became angry with Jennifer for telling other students in the program about her attack, she was never upset with Jennifer for telling Professor Parkhurst about the rape. (Id. at 229).

Professor Parkhurst provided Amy with no information about a hotline she might call or hospital information. (Id.). Rather, Amy was taken to her dorm room by Professor Parkhurst without having gone to the hospital or the police. (Id. at 231). She called a friend in the United States and told him of the rape. (Id. at 231).

The following morning, Amy was still experiencing cramping and bleeding from the attack. (Id. at 231). Nevertheless, she was not taken to the hospital until the following day **Wednesday, July 7, 2004.** (Id.). Amy was accompanied to the hospital by Professor Parkhurst and Jennifer. (Id.). Amy was told at the hospital that if the visit was not paid for up front, she would not be admitted. (Id. at 232). Amy paid for the visit and was admitted.

4

(Id.). After the physical examination, Amy was seen by a psychiatrist. (Id. at 233). The psychiatrist made Amy very uncomfortable. (Id.). Amy was given a prescription for the "morning after pill" and a prescription for an antidepressant and filled the prescription at a local drugstore. (Id. at 234-235).

It was late evening after Amy filled her prescriptions and she and Jennifer stopped at a restaurant to eat dinner. (Id. at 235). During the walk from the restaurant to the dorms, Amy's attacker drove by and began to shout things out the window of his car at the two girls. (Id. at 236).

### D.  Amy is Finally Taken to Police

After the rape, a rumor was started among the students that Amy and Professor Parkhurst were having an affair because of the time they were spending together behind closed doors. (Id. at 238). Professor Parkhurst decided to have a class meeting to address the rumors. (Id.). In front of the entire class, Professor Parkhurst openly discussed Amy's assault and rape with the students. (Id. at 239). The entire class was devoted to discussing the incident *in front of Amy* who was crying and visibly upset.

On **Friday, July 9**, Amy again spoke with Professor Parkhurst about the rape. (Id. at 242). At this point, a police report had not been filed. (Id. at 241). Professor Parkhurst questioned Amy's sincerity about the rape and questioned whether the rape even occurred. He also asked Amy several sexually explicit questions she felt were inappropriate. (Id. at 242). Amy reiterated that she wished to go to the police station to see what could be done about her attack. (Id.). Professor Parkhust finally agreed to drop the girls off at the police department.

5

After providing a statement to the police, Amy returned to the dorms to retrieve some pictures of Pedro that had been taken on another girl's camera on the night of the attack. (Id.).

### E. Amy's Return to the United States

Despite Amy's desire to remain in Lisbon because of her need to complete the study abroad program and receive credit for same, Professor Parkhurst forced her to return to the United States. (Id. at 262). Amy returned to the United States on July 23/24, 2004. (Id. at 19). At no time has anyone provided Amy with the names of counselors with whom she might speak. (Id.). Amy has sought medical and psychological assistance on her own. Since her return from Portugal Amy has never been contacted by anyone from UofL concerning the rape or been offered assistance of any kind.

In sponsoring such a program as the one in which Amy participated, UofL undertook a duty to protect the Plaintiff and to warn of foreseeable risks involved in traveling to a country such as Portugal. Amy entrusted her safety to the Defendants and granted "full authority" to act for her "health and safety" during the duration of the University sponsored program. (See Student Release and Assumption of Risk, attached hereto as Exhibit "A"). The Defendants failed to provide Amy and the other students with sufficient information regarding safety and security issues. The Defendants also failed to convey and institute guidelines and/or instructions for safe travel and stay in Portugal.

Following the rape, the Defendants failed to appropriately and effectively assist Amy in seeking medical attention or in contacting the police. Since her return to the United States, the Defendants have never offered assistance in the prosecution of the assailant and failed to offer support of any kind concerning the rape or resulting injuries.

6

## ARGUMENT

### I. SUMMARY JUDGMENT STANDARD

Summary Judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001). A fact is material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party satisfies its burden the burden shifts to the non-moving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It is not sufficient for the non-moving party merely to show that there is some existence of doubt as to the material facts. (Id.)

In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *National Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997). Ultimately, the court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996) (internal citations omitted).

7

## II. DEFENDANT UNIVERSITY OF LOUISVILLE FAILED TO PROVIDE THE PLAINTIFF WITH A SAFE AND SECURE EDUCATIONAL ENVIRONMENT AS REQUIRED BY TITLE IX

### A.

Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq. applies to all public and private institutions that receive federal funds, including UofL. Title IX provides in pertinent part:

> "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.S. § 1681(a).

It has long been recognized that sexual harassment of students by third-parties is covered by Title IX. The premise of Title IX is clear: preventing and remedying sexual harassment is essential to ensuring a safe environment in which students can learn. See *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 643 (1999) (finding that Title IX "unquestionably" imposes a duty on universities to not permit harassment).

Universities must provide students with a "safe and secure" educational environment and "use *reasonable care* to prevent injury to their students by third persons whether their acts were accidental, negligent, or intentional." *Mullins v. Pine Manor College*, 389 Mass. 47, 54-55 (Mass. 1983).

Courts have found that a "special relationship" exist between universities and students based on the university's "superior knowledge" of foreseeable risks. See *Gross v. Nova Southeastern University, Inc.*, 716 So.2d 337 (Fla. App. 1998). In *Gross,* the Court found that an adult student participating in an off campus approved program is entitled to reasonable care from the sponsoring university with regard to protection from foreseeable

8

dangers. (Id.); see also *Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1366-69 (3d Cir. 1993).

Title IX prohibits discrimination on the basis of sex and recognizes that a sexual assault is a single act of harassment so severe so as to fit into the legal definition of sexual harassment at educational institutions.[2] See *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (assertion that victim was raped, sexually abused and harassed "obviously qualifies").

### B.

Under Title IX, a plaintiff must prove that she was subjected to unwelcome sexual harassment, the harassment affected a term, condition or privilege of the plaintiff's education and the defendants knew or should have known of the harassment and failed to take proper action. *Franks v. Kentucky Sch. for the Deaf*, 956 F. Supp. 741, 746 (D. Ky. 1996). Here, UofL was obligated to take reasonable measures to protect against Amy and the other students' safety from being subjected to sexual harassment and foreseeable criminal conduct while on the study abroad.

### C.

Amy's attack was foreseeable. Any contention by Defendants otherwise is untenable in light of Professor Parkhurst's own knowledge of Portuguese culture, specifically his knowledge that Portugal is a male-dominated society where women generally fulfill more submissive roles. In fact, Professor Parkhurst has authored numerous articles, including his dissertation thesis for his doctorate degree on the overtly conservative view of women

---

[2] Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 66 Fed. Red. 5512-01, Part V.A (Jan. 19, 2001), available in full at http://www.ed.gov/about/offices/list/ocr/docs/shguide.pdf

9

in society in Portugal, as well as violence towards women and gender stereotypes. One particular article authored by Professor Parkhurst, published in the Anthropologica Journal, Vol. XLI No. 2, 1999, cites the following when discussing elements of women's autonomy and male dominance in northern Portugal:

> "A father has all the authority and if it is necessary to shout or to beat, he will." "The father or eldest male holds the reign of authority." "[p]arents should closely supervise young women's comportment because of the threat of 'shameful' (sex-related) behaviour.[3]"

Professor Parkhurst concludes his article by saying "there are patterned gender relations which suggest a form of male dominance which is linked to the ecology and economy of the area." (Id.) The risks of such a criminal attack were not only foreseeable by Defendants – they were actually known to Defendant Parkhurst.

A university has a duty to exercise reasonable care in taking such measures as were reasonably necessary to protect young women's safety in light of all the existing circumstances. *Schultz v. Gould Acad.*, 332 A.2d 368 (Me. 1975); see also *Wilson v. Webb*, 869 F. Supp. 496, 497 (D. Ky. 1994) (holding that students have a liberty interest in their bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment); see also *Mullins v. Pine Manor Coll.*, 449 N.E.2d 331 (Mass. 1983), finding a duty owed to a female college student who was attacked by an intruder on a campus outside of Boston).

The *Mullins* court recognized that the concentration of young people, especially young women, on a college campus, creates a favorable opportunity for criminal behavior. (Id. at 335 & n. 7). The Court also concluded that foreseeability was not dependent upon

10

evidence of prior criminal acts and that the precautions taken by the College to protect students against criminal activities would make little sense unless criminal activity was foreseeable. (Id. at 337).

U of L was cognizant that supervisors and faculty should educate themselves as to potential risks or hazards associated with foreign travel. They further contemplated that these risks and hazards should be disclosed to the students. U of L's guidelines for developing study abroad programs states:

> Current lawsuits in the U.S. involving international programs include those related to **sexual harassment**, automobile accidents, and illnesses contracted at the program site. **It is vital for program administrators to be well informed of potential hazards, and to disclose possible dangers to their students.** (University of Louisville International Center Guidelines for Developing International Programs, attached hereto as Exhibit "C") (emphasis added).

Because of Professor Parkhurst's superior knowledge of the male-dominated Portuguese culture, the risks of such an attack was obvious. Unfortunately, the risks were ignored and not discussed with the students participating in the study abroad. Likewise, the University of Louisville knew or should have known of the existence of assaults, attacks, and rapes of female students participating in study abroad programs or on foreign campuses. Many studies have shown college woman are at an elevated risk for sexual victimization, including women studying abroad in male dominated cultures. These risks were not discussed with the students.

---

3 Anthropologica article attached hereto as Exhibit "B"

## III. DEFENDANT UNIVERSITY OF LOUISVILLE FAILED TO TAKE PROMPT AND EFFECTIVE REMEDIAL MEASURES TO ADDRESS THE HARASSMENT SUFFERED BY PLAINTIFF

### A.

Since 1975, Title IX has required colleges to "adopt and publish a policy against discrimination and grievance procedures providing for the prompt and equitable resolution of complaints of discrimination on the basis of sex." Revised Sexual Harassment Guidance, supra, note 2. The lack of response or an inadequate response to reports of sexual harassment is included in the concept of gender discrimination. *Davis, supra,* 526 U.S. at 642-43.

To impose liability based on the lack of response, under Title IX, a plaintiff must demonstrate that she was subjected to sexual harassment, she provided actual notice to the appropriate person with the university and the university's response to the harassment amounted to deliberate indifference. See *Klemencic v. Ohio State University*, 263 F.3d 504, 510 (6th Cir. 2001).

### B.

It is not disputed Defendants Parkhurst and UofL had knowledge of the sexual attack. Still, Amy was denied a prompt and reasonable response to her attack. She has been denied any effort on the part of the Defendants to remedy the effects of the rape and the Defendants have failed and continue to fail to participate in any meaningful way as to the prosecution of the Plaintiff's assailant or Amy's therapy and counseling.

Where a school has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such school has failed to act reasonably in light of the known circumstances. *Davis, supra,* 526 U.S. at 641.

12

Despite that Parkhurst and UofL received notice of Amy's rape immediately after its occurrence, the University continued to have a duty under Title IX to take some action to prevent the further harassment of Amy. The Defendants failed to provide remedial measures following Amy's rape. Amy's crucial need for immediate medical and legal assistance following the rape was blatantly ignored by Defendants.

### C.

Following the rape, Amy was not taken to the police or provided with any other protective measure at all by the Defendants. When Professor Parkhurst **finally** took Amy to the hospital three days after her rape, he then dropped Amy and Jennifer off at a pharmacy and left them alone. On the walk home, Amy encountered the attacker who screamed obscenities out his car window. Fortunately, Amy and Jennifer were able to divert their path and avoid another encounter with Amy's assailant.

Also, when Amy was finally able to convince Professor Parkhurst that she needed medical attention on the afternoon of Wednesday, July 7, 2004, Professor Parkhurst began to question the sincerity of Amy's account of the rape and asked her inappropriate sexual questions. In addition, at this time, Amy had still not been taken to a police station in order to file a police report.

Not only was Professor Parkhurst's behavior following the rape inappropriate and harmful, he then conveyed Amy's assault to the entire classroom with Amy present in order to clear himself of any suspicious behavior. There is no question Professor Parkhurst's actions created a hostile environment for Amy while in the classroom setting in Lisbon, as well as when she returned to UofL. Since her return to the United States, Amy has received no offer of assistance from UofL.

There is no question that a rape, as alleged by Amy, constitutes severe and objectively offensive sexual harassment under the standard set forth *Davis*. *See Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999). At a minimum, the Plaintiff has raised an issue of material fact concerning the conduct and response of the Defendants related to her rape.

### D.

*Davis* affirmed that "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct." *Davis*, 526 U.S. at 640; see also *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 118 S. Ct. 1989, 1998, 141 L. Ed. 2d 277 (1998). Applying this principle, the Court found the *Davis* plaintiff had a viable claim because she attempted to hold the defendant school board liable for its own decision to remain idle in the face of known harassment in its program. *Davis*, 526 U.S. at 641. Title IX permits liability in such a case.

In order to confine Title IX liability to those cases in which the school itself acted improperly, *Davis* imposes liability if the school remains deliberately indifferent to acts of harassment of which it has actual knowledge. (Id. at 645-646). The Supreme Court has described deliberate indifference as a "clearly unreasonable response in light of the known circumstances." *Davis*, 526 U.S. at 648. Deliberate indifference must, at minimum, cause students to undergo harassment or make them vulnerable to it. *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253 (6th Cir. 2000). Title IX requires that the school make an effort to remedy known harassment in a manner that is not "clearly unreasonable" *Davis*, 526 U.S. at 648-49.

14

i. **Title IX Regulations concerning Colleges' and Universities Response to Sexual Assaults**

In 2001, the U.S. Department of Education promulgated revised guidelines for Title IX.[4] In doing so, the guidelines stated: "a critical issue under Title IX is whether the school recognized that sexual harassment has occurred and took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects. _If harassment has occurred, doing nothing is always the wrong response_." (emphasis added).

ii. **Providing Assistance and Accommodations**

In accordance with Title IX, once informed of an occurrence of a sexual assault, a school must take "prompt and effective" measures to relieve any ongoing hostile environment and prevent its recurrence. Schools should ensure that staff and faculty members who are most likely to receive first reports of sexual assault are trained. These individuals, such as residential advisors, health care workers, security officers, and academic advisors, should be able to provide sensitive guidance to students who confide in them. At the least, these people should be able to refer complaining students to an employee who can provide assistance. Title IX and its regulations require that schools designate one or more employees to act as a "Title IX Coordinator." This employee is responsible for knowing and administering sexual harassment and sexual assault policies in accordance with legal regulations. See 38 Suffolk U. L. Rev. 395, 405, citing Revised Sexual Harassment Guidance, (citing 34 C.F.R. 106.31(b), 106.8(a)).

---

[4] http://www.ed.gov/about/offices/list/ocr/docs/shguide.pdf

15

When Amy was finally able to convince Professor Parkhurst that she needed medical attention on the afternoon of Wednesday, July 7, 2004, Professor Parkhurst began to question the sincerity of Amy's account of the rape and asked her inappropriate sexual questions. In addition, at this time, Amy had still not been taken to a police station in order to file a police report and when Professor Parkhurst did speak in Portuguese with officers at the hospital, Amy was never told or understood what had been said.

Further, Amy was never provided with counseling information by the Defendants, much less assigned a Title IX Coordinator. The Defendants' actions following the assault and rape were anything but prompt or effective.

### iii.  Adequate Investigation.

Schools and universities also have a duty to provide for adequate and independent investigations of sexual assault complaints, as clearly defined in the Title IX regulations. <u>Revised Sexual Harassment Guidance, supra note 2 at 15, 20</u>. To prevent a hostile environment brought about by the investigation process, investigations should follow clear and established rules. (Id.) Not only was Amy deprived of any University assisted investigation while in Portugal and following the rape, she has not been contacted once upon her return to the States with regards to the investigation or prosecution of her assailant, all in violation of Title IX.

The Defendants make much of "evidence" referred to regarding the theory that Amy did not wish to immediately come forward and make a complaint. According to the Regulations, regardless of whether the student who was harassed decides to file a formal complaint or otherwise request action on the student's behalf, the school must promptly investigate to determine what occurred and then take appropriate steps to resolve the

situation. 62 FR 12034, 12042-12043. The specific steps in an investigation will vary depending upon several factors. However, in all cases the inquiry must be prompt, thorough, and impartial. (Id.).

### iv. Third-Party Harassment

Sexually harassing conduct of third parties, who are not themselves employees or students at the school can also cause a sexually hostile environment in school programs or activities. 62 FR 12034, 12042-12043. For the same reason that a school will be liable under Title IX for a hostile environment, a school will be liable if third parties sexually harass its students if (i) a hostile environment exists in the school's programs or activities, (ii) the school knows or should have known of the harassment, and (iii) the school fails to take immediate and appropriate corrective action. See 62 FR 12034, 12040. See also *Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 250 (2d Cir. 1995) (holding that, like student-on-student harassment, a school's liability for the harassment of its students by **third parties** is based on its obligation to provide an environment free of discrimination).

## IV. DEFENDANTS' BREACH OF IMPLIED CONTRACT OF SECURITY

Prior to the students' departure for Portugal in June of 2004, Defendant Professor Parkhurst provided them with an orientation packet. One of the documents in this packet was entitled "Student Release and Assumption of Risk." At paragraph (4), the document provided:

> I grant the University of Louisville and its agents full authority to take whatever actions they may in their sole judgment consider to be warranted under the circumstances regarding my health and safety curing the period of this activity and associated travel. Specifically, I authorize the University of Louisville and its agents, at their discretion, to place me at my own expense and without further consent in a hospital for medical services.

17

Defendants claim Plaintiff's implied contract of security claim is not properly before this Court pursuant to KRS § 44.270(1). Defendants also assert they are entitled to sovereign immunity on this claim. For the Court's convenience, KRS § 44.270(1) has in fact been repealed and reenacted at KRS § 45A.245, providing as follows:

> (1) Any person, firm or corporation, having a lawfully authorized **written contract** with the Commonwealth at the time of or after June 21, 1974, may bring an action against the Commonwealth on the contract, including but not limited to actions either for breach of contracts or for enforcement of contracts or for both. Any such action shall be brought in the Franklin Circuit Court and shall be tried by the court sitting without a jury. All defenses in law or equity, **except the defense of governmental immunity,** shall be preserved to the Commonwealth.

The Release was signed by the Plaintiff, dated and witnessed on March 30, 2004, and constitutes a written contract for purposes of Plaintiff's claim. Plaintiff has alleged an implied contract based on written documents signed by the parties, **not** an oral contract. Pursuant to *All-American Movers, Inc. v. Commonwealth ex rel. Hancock*, 552 S.W.2d 679, 1977 (Ky. App. 1977), sovereign immunity has been waived on lawfully authorized written contracts. The statute itself recognizes that a contract waives any claim of immunity.

The Plaintiff's enrollment and participation in the study abroad program placed an affirmative duty upon the Defendants to exercise due care for her protection. In similar circumstances, Courts have found a special duty of care arising pursuant to a signed consent form which is required of a student prior to participating in a study abroad program such as the trip to Lisbon. See *Fay v. Thiel* College, 55 Pa. D&C 4th 353 (2001). The release signed by Ms. Mattingly required she grant "full authority" to the University and its agents to act for her "health and safety" during the period of this activity. The release, along with other documentation provided to Amy by the Defendants, further imply a

contract of security between the parties - a duty which was breached by Defendants' failure to take reasonable protective measures to ensure Plaintiff's safety while in Portugal.

## CONCLUSION

Had Defendants properly prepared, warned and instructed Ms. Mattingly on the dangers they *knew* she and the other students would face in Portugal, this extremely unfortunate incident may not have occurred. The Plaintiff was deprived of a safe and secure learning environment which Title IX was intended to ensure. Following the Plaintiff's rape, remedial measures required of the Defendants pursuant to Title IX were blatantly ignored, causing further suffering to the Plaintiff. Title IX encompasses harassment by not only teachers and other students, but also by third-parties.

For this, and the reasons presented above, Plaintiff respectfully requests that the Defendants' Motion for Summary Judgment be denied.

Respectfully Submitted,

_____
ERIC J. JACOBI
JAMES M. GREEN
Clay, Kenealy, Wagner & Adams, PLLC
462 South Fourth Street
1730 Meidinger Tower
Louisville, Kentucky 40202
Phone: (502) 561-2005
Facsimile: (502) 589-5500
**Counsel for Plaintiff Amanda Mattingly**

19

## CERTIFICATE OF SERVICE

It is hereby certified that a true and correct copy of the foregoing was this 30th day of June, 2006, mailed to all parties identified below:

Donna King Perry, Esq.
Wendy Carole Hyland, Esq.
WOODWARD HOBSON & FULTON LLP
2500 National City Tower
Louisville, Kentucky 40202

_____
Eric J. Jacobi